**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DEMETRIC GODFREY and** | * | |
| **DEBORAH GODFREY** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **v.** | * | **Civil Action No.: 1:12-CV-00081-WS-B** |
| | * | |
| **NATIONWIDE VINYL SIDING &** | * | |
| **HOME IMPROVEMENT, LLC,** | * | |
| **FIRST CHOICE MORTGAGE, LLC.** | * | |
| **and U.S. BANK N.A.,** | * | |
| | * | |
| **Defendants.** | * | |

**NARRATIVE STATEMENT OF FACTS AND LEGAL MEMORANDUM IN
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiffs Demetric Godfrey and Deborah Godfrey and in response and

in opposition to the Motion for Summary Judgment filed by Defendant US. Bank (Doc. 22), submits

the following:

**NARRATIVE STATEMENT OF FACTS**

**The Godfreys and the Home Improvement Contract**

Deborah and Demetric Godfrey live at 2505 Highland Drive, Mobile, AL 36617 (hereinafter

the "Property") in Mobile.  They lived there for 24 years.  In 2008, the Godfreys were considering

remodeling their home to add additional rooms upstairs and on the ground level.  In July 2008, Mrs.

Godfrey received an unsolicited call from Steve Cooper, a sales representative of Nationwide Vinyl

Siding and Home Improvement, LLC ("Nationwide").   Mrs. Godfrey explained that they were not

interested in vinyl siding, but were considering remodeling.  Those discussions ultimately led to an

estimate and construction contract.  (Deposition of Deborah Godfrey ("Deborah Godfrey Depo."), excerpt of which are attached hereto as Exhibit 1, pp. 12-13).  As discussions advanced, the Godfreys began dealing with Donald Duncan, the sole owner and principal of Nationwide.

The contract was signed on September 5, 2008, and contemplates two phases of construction with a total price, for both phases, of $99,500.  The contract specified the items to be covered under phase 1. (See Exhibit 2).    These items do not include the heating and air-conditioning system, which was to be included in phase 2 (Deborah Godfrey Depo. (Ex.1), pp. 21-22).  The total price for phase 1 was $62,500, with a deposit of $10,000 was due at signing.  (See Exhibit 2).  Plaintiffs expressed concern over the $10,000 down payment but were assured by Duncan that this would be handled as part of the loan.  Ultimately, Duncan  arranged for this to be paid through two credit card accounts, each in the amount of $5,000, opened by Nationwide for the Godfreys for this purpose. (Deborah Godfrey Depo. (Ex.1), pp.18, 97).

From the beginning, the Godfreys were told that the contract would be financed through Nationwide. (Id., p.85).  Mr. Duncan explained the beginning that his company would be handling the financing of the loan.  On the day the construction contract was signed, the Godfreys were presented papers concerning financing, including a loan application, Truth-in-Lending Disclosure and a list of documents required for financing.  All of these documents identified the lender as First Choice and the address listed for First Choice was the same address listed for Nationwide.  (See Exhibit 3).  The Godfreys were also presented a preliminary TILA disclosure which identified the lender as First Choice Mortgage.  (Id.)  The Godfreys signed these papers and provided the documents requested by Nationwide/First Choice.  Throughout this process, Mr. Duncan stated that "his company," would arrange the financing and led the Godfreys to believe that  Nationwide and

First Choice were the same company. (Deborah Godfrey Depo. (Ex.1), pp.14, 85).   Several days later, the Godfreys received through the mail another set of preliminary loan documents from US Bank.  ( See Exhibit 4).  Until then, they presumed that the lender would be Nationwide/First Choice. (Deborah Godfrey Depo. (Ex.1), pp.29, 31 - 33).

**Nationwide and First Choice**

Nationwide and First Choice are both companies formed and operated by Donald Duncan. Mr. Duncan is the sole owner of both companies.  (See Exhibit 5; Deposition of Donald Duncan ("Duncan Depo."), excerpts attached as Exhibit 6, pp. 23, 31-32).  Both companies operated from the same location and with the same employees. (Duncan Depo. (Ex. 6), pp. 37-41). Moreover, Duncan admits that he co-mingled funds, including brokerage fees paid to First Choice, and used those fees to operate Nationwide. (Id., pp.40-41).  This coupling of the two companies is consistent with the Godfreys' impression that Nationwide and First Choice were the same company.  (Deborah Godfrey Depo. (Ex.1), p.85).

**The Closing**

The loan closing was arranged by the Nationwide for November 10, 2008.  During this process, the Godfreys began dealing with Donald Duncan's wife, Charlotte.  At the closing, the Godfreys were presented loan papers for an adjustable rate mortgage, in the amount of $61,200, with an initial interest rate of 7.55%, to be capped at 13.55%. The interest rate could never go below the initial 7.55% rate. This was problematic because the Godfreys were adamant in their discussions with Nationwide that they wanted a fixed-rate loan. However, based on assurances by Mrs. Duncan that they would be allowed to refinance the mortgage within six months with a fixed-rate loan, the Godfreys executed the loan documents.  (Deborah Godfrey Depo. (Ex.1), pp.34-35, 45-46).

3

At the closing, the Godfreys represented a HUD settlement form which set out the fees and disbursements to be paid out from the loan proceeds. (See Exhibit 7). The HUD identifies a yield spread premium paid the First Choice in the amount of $1,224 (line 808), a broker fee paid to First Choice in the amount of $612 (line 809), and a fee paid to Nationwide, with no description, in the amount of $4,800 (line 1307). These fees paid to First Choice/Nationwide are in addition to the $52,500 which was identified as a "pay off" to Nationwide (line 1306). This "pay off" matches the contract price, minus the $10,000 down payment. The HUD also showed a payment to the Godfreys in the amount of $492.47 (line 303). (Id).

No one went over this form with the Godfreys and no one explained the fees being paid to Nationwide/First Choice. (Deborah Godfrey Depo. (Ex.1), pp.56, 57). These fees are presented as non-negotiable and as a "take it or leave it" proposition. The Godfreys understood that it was required that they sign the HUD in order to proceed with the project. (Deborah Godfrey Depo. (Ex.1), pp. 93 – 94). No one ever explained to the Godfreys what the $4,800 charge was for and, even at the time of Mrs. Godfrey's deposition, she still did not know what that charge was for. (Deborah Godfrey Depo. (Ex.1), pp. 57-58).

At the closing, the Godfreys were instructed to return to the closing office to pick up the loan proceeds checks two weeks after the closing. At that point, they assumed that the proceeds would be distributed to them so that they could pay Nationwide as the work was being completed. However, when they returned to the closing office to pick up the checks, the only check delivered to the Godfrey's was the disbursement of the $492.47 identified in line 303 of the HUD settlement statement. (Deborah Godfrey Depo. (Ex.1), pp. 61 – 65). Mrs. Godfrey asked the closing agent about the $52,500 check for the contract price and she was told to contact Nationwide. She never

4

got a straight answer from Nationwide as to whether it had received the funds. She did receive promises that the work on her home would start soon. (Deborah Godfrey Depo. (Ex.1), pp. 65 – 67).

Even though the contract was signed in September and funded in November 2008, work did not start on the Godfreys' home until February 2009. (Deborah Godfrey Depo. (Ex.1), p. 66). After construction began, Mrs. Godfrey spoke to the Nationwide construction workers regarding the contract funds. She was told that Nationwide typically is paid in draws from the mortgage company as various stages of the project are completed. Based on this, the Godfreys assumed that their money would not be paid to Nationwide until the mortgage company was satisfied that the work had been done. (Deborah Godfrey Depo. (Ex.1), pp. 61, 68). Ultimately, Nationwide stopped working on the project all together, leaving the addition unfinished and much of what was done was defective.

The Godfreys encountered problems with Nationwide's performance of the construction contract from almost the beginning. Aside from the delay in starting the project, problems surfaced almost immediately after work began. The crew that was in the process of pouring the foundation for the addition, stopped work because it had not been paid by Nationwide. (Id., pp. 69 – 71).

**The $4,800 Charge**

At no point prior to this litigation did either Nationwide or US Bank explain to the Godfreys that the $4,800 payment to Nationwide was for work relating to an HVAC system. The HVAC system was never part of the phase 1 contract. (Id., 19, 79). No HVAC system is listed in phase 1 of the written contract and, according to the Godfreys, no price was ever quoted and no agreement was ever reached concerning the installation of an HVAC system. (Id., p. 20). It simply was not part of their agreement. The issue regarding an HVAC system arose only after the contract was

signed.  The Godfreys received a call from Mrs. Duncan who told them that there was a problem with the financing because the finance company (which was later identified as US Bank) had rejected the appraisal because it did not mention an existing central HVAC system.  Mrs. Godfrey explained that they did not have any money to install an HVAC system at this point. (Deborah Godfrey Depo. (Ex.1), pp. 21 – 22). It was explained to Mrs. Godfrey that this was temporary and that the  permanent HVAC system would be installed as part of phase 2. (Deborah Godfrey Depo. (Ex.1), pp. 23). The Godfreys had intended to install, as part of phase 2, an HVAC system that was large enough to service the entire house, including the additional rooms.  To do this, the system would necessarily need to be installed after phase 1 construction was complete. It was therefore understood that the HVAC system would be part of phase 2.  Moreover, the Godfreys were clear that they did not want a heat pump system. After the Godfreys were notified that the financing company was requiring a central system on the existing structure and Nationwide unilaterally installed a heat pump to service the existing structure only.  It was not big enough to service the additional space contemplated in phase 1.  (Id., pp. 90-92).  When the heat pump was delivered, Mrs. Godfrey spoke to Mrs. Duncan and asked why this was being installed.  She was told that this was a required by the finance company but that she "didn't have to worry about it because they (Nationwide) were going to pay for it."  (Id., 21-22; see also p. 99-104).  During installation, the installer told Mrs. Godfrey that she would need additional duct work.  She then called Nationwide and spoke to Mr. Cooper who told her "Don't worry, Nationwide is going to pay for this."  (Id.,100-102).

In November, the Godfreys received credit card statements on the accounts opened for financing the $10,000 down-payment.  A $5,000 payment had been advanced on each account.  One of the statements indicates a $5,000 charge, dated October 16, 2008, was for purchase of an HVAC

system.  (See Exhibit 7).  This charge was made about 3 weeks before the loan closing.  Mr. Duncan testified that he processed two payments using these credit card accounts and provided the description of what each charge was for.  Funding construction work through credit card payments is a common practice with Duncan.  (Duncan Depo. (Ex.5), pp. 60).  The procedure in processing the payment involves Duncan submitting a form to the credit card company describing the work that the payment is for.  (Id., pp. 62).  Mr. Duncan confirmed that the reference to the HVAC system that appeared on the Godfreys' credit card statement was provided by him.  (Id., pp. 73-74).  He also confirmed that Nationwide received the $5,000 payment from the credit card company for the HVAC system.  (Id., p. 74).  Therefore, the $4,800 could not have been for the HVAC system because Nationwide/First Choice had already been paid for it.

Just before the Godfreys' depositions, US Bank produced a document purporting to be a fax from First Choice to US Bank dated October 27, 2008.[1]  Attached to the fax coversheet is an unsigned document granting permission by the Godfreys to Nationwide to install an HVAC system for $4,800.  (See Exhibit 11).  Although the document contains signature lines for the Godfreys and for Steve Cooper, there are no signatures on that document.   Mrs Godfrey testified that she had never seen that document, did not sign it and would not have signed had it been presented to her.  (Deborah Godfrey Depo. (Ex.1, pp. 19-20).  Mr. Godfrey confirmed that there were no discussions regarding any $4,800 charge for an HVAC unit.  (Deposition of Demetric Godfrey ("Demetric Godfrey depo."), excerpts of which are attached as Exhibit 12).  Just before the US Bank deposition, US Bank produced another document purporting to document that $4,800 charge.  This document

---

[1]The Godfreys were deposed August 13, 2012.  This document was produced on August 7, 2012 (See Exhibit 9), despite the fact that Plaintiffs had requested US Bank to provide all documents relating to the Godfreys' loan back in January 2011.  (See Exhibit 10).

purports to be an Addendum to the Nationwide construction contract and purports to be signed by the Godfreys. (See Exhibit 13). According to US Bank's representative witness, this document was in its files all along. (Deposition of Eugene Simon ("Simon Depo.") excerpts which are attached as Exhibit 14, p. 54). Because it was not produced until after the Godfreys' depositions, it was not presented to them. However, they have since reviewed that document and both insist that they did not sign, nor had they ever seen that document. (See Exhibits 15 and 16). According to the Godfreys, the signatures are attempts to simulate their actual signatures, but are forgeries. Each of the Godfreys are familiar with their spouse's handwriting and signatures. Each testifies that not only is their own signature not authentic, but also that their spouse's signature is forged. (Id.).

**The Qualified Written Request**

On February 4, 2011, the Godfreys, through counsel, mailed US Bank a notice of cancellation of loan and a qualified written request ("QWR"), pursuant to the Real Estate Settlement and Procedures Act, 12 U.S.C. 2605(e). The QWR requested the following information:

♦     An itemized description of how the loan proceeds were distributed, including a statement of each person or entity receiving any part of the proceeds, the amount received and the reason for payment;

♦     A complete payment and transaction history for this loan;

♦     A copy of the borrower's loan file including any and all documents executed in connection with this loan;

♦     Identification of the current holder of the mortgage, if you contend you do not hold the mortgage, and the date on which that holder acquired the mortgage.

(Exhibit 17)

On March 3, 2011, U.S. Bank responded to the notice of cancellation and qualified written request with the letter faxed to the Godfrey's counsel. (Exhibit 18). That letter did not include any

8

of the documents or information requested by the Godfreys. (Simon Depo., Ex. 14, pp. 65-66). Instead, the letter included the following statement: "Your letter requests production of a significant number of documents as part of our response. Please be advised U.S. Bank may charge a fee of $10.00 per document provided in response to your letter. This will be charged directly to your client's [sic.] account and will be reflected on their monthly mortgage statement." (Exhibit18). The letter also stated U.S. Bank's refusal to cancel the contract.

On January 18, 2011, the Godfreys served discovery requests to U.S. Bank. (Exhibit10). Those requests included all documents related to the subject loan. On April 6, 2011, U.S. Bank produced documents in response to the request for production. Although those documents included loan documents, they did not include any payment history as specifically requested in the Godfreys' QWR. (See Exhibit 15). No documents were produced in response to the QWR until the April 6, 2011 and no other action was taken by US Bank in response to the letter. (Simon Depo., Ex. 14, pp. 66-67).

## LEGAL MEMORANDUM

### A.    There Exists a Genuine Issue of Fact as to Whether US Bank Violated HOEPA

US Bank argues only that the loan is not covered by HOEPA as a matter of law. It is undisputed that US Bank did not provide the additional disclosures required under HOEPA[2] or that the loan violates substantive prohibitions imposed by HOEPA, such as the prohibition on direct payments to home improvement contractors, 15 U.S.C. § 1639(i).

There is substantial evidence which would support a finding that the Godfreys' loan is a "high cost" loan within the meaning of 15 U.S.C. § 1602(aa), and thus subject to the more stringent

---

[2]See Deborah Godfrey Affidavit, Exhibit 15.

9

TILA requirements applicable to such loans.  (Complaint, ¶¶ 58-61, 75-81). These requirements were ushered in as part of the Home Ownership and Equity Protection Act ("HOEPA"), 15 U.S.C. 1602 (aa) and 1639.  HOEPA, which amended TILA, was passed in 1994 in response to increased abuses in the mortgage lending marketplace, including those related to home improvement contracts. Congress therefore imposed stricter prohibitions on loans with "total points and fees" which exceed 8% of the "total loan amount." 15 U.S.C. § 1602 (aa)(B). Once a loan is covered by HOEPA it is subject to a laundry list of prohibited terms and notice requirements. 15 U.S.C. § 1639 (c) – (j).  This includes a prohibition on direct payments to home improvement contractors.  15 U.S.C. § 1639 (i). A loan is governed by HOEPA if the total "points and fees" exceed 8% of the total loan amount. 15 U.S.C. § 1602 (aa)(B). Points and Fees, as defined by 15 U.S.C. § 1602 (aa) (4) and Regulation Z, 12 C.F.R. § 226.32 (b) (1), include: 1) all Finance Charges as defined by Reg. Z § 226.4, except for actual interest payments,15 U.S.C. § 1602 (aa)(4)(A); 2) all compensation paid to mortgage brokers, 15 U.S.C. § 1602 (aa)(4) (B); and, 3) all closing costs listed in 15 U.S.C. § 1605 (e) except those which are "reasonable," and not paid to the lender or its affiliate. 15 U.S.C. § 1602 (aa) (4) (C).

Plaintiffs identify in their Amended Complaint numerous charges which qualify as a "point and fee."  However, as US Bank correctly states in its brief,[3] the loan only qualifies as a "high cost loan" if the $4,800 payment listed on line 1307 is considered a point and fee.  Without this inclusion of this payment as a "point and fee," the loan does not meet the trigger.  Therefore, it is not necessary for the parties or the Court to address the other fees.

There exists ample evidence to support a finding that the $4,800 is a "point and fee." First, there is sufficient evidence to support a jury finding that the fee was broker compensation.  The

---

[3]See Doc. 23, note 2

definition of "points and fees" specifically includes "<u>all</u> compensation paid to mortgage brokers." 15 U.S.C. § 1602 (aa) (4).  Official Commentary to Regulation Z, specifies that this includes "compensation paid by a consumer to a mortgage broker (*directly or through the creditor for delivery to the broker*)..."  12 C.F.R. Commentary § 226.32(b)(1)(iii)(emphasis added).[4]  Although the payee is designated on the HUD as Nationwide, the evidence establishes that Nationwide and First Choice are the same business enterprise.  Both are exclusively owned by Donald Duncan, who held those companies out to the Godfreys as the same and who was actively involved in arranging the financing of the contract.  Moreover, Mr. Duncan testified that he comingles the funds received by both companies and there is no separation between the two when it comes to payments.  The payments to both companies go to the fund the same enterprise.  Thus, Duncan, principal of both Nationwide and First Choice, the nominal broker, spearheaded the financing effort.  The payment to Nationwide is for all practical purposes a payment to First Choice.  <u>Hodges v. Swafford</u>, 863 N.E.2d 881, 887 (Ind. Ct. App. 2007)(fee to third party deemed compensation to broker for purposes of HOEPA because third party actively participated in transactions between borrower and lender).

The case of <u>Cunningham v. EquiCredit Corp. of Illinois</u>, 427 F. Supp. 2d 838, 839 (N.D. Ill. 2006) <u>aff'd sub nom.</u>  <u>Cunningham v. Nationscredit Fin. Services Corp.</u>, 497 F.3d 714 (7th Cir. 2007), is instructive.  That case involved a home improvement loan to finance a contract financed by Equicredit through a loan broker - the Loan Center.  Moore, an employee of the Loan Center, arranged the financing.  The HUD showed a broker payment to the Loan Center and another

---

[4]Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive". *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (U.S. 1980) See also *Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001)( "The Official Staff Commentary to Regulation Z published by the Board is binding and dispositive in TILA cases unless the commentary is determined to be demonstrably irrational.")

payment to an unrelated entity identified as D & E Services.  After closing, the plaintiff realized that D& E Services was owned and operated by Moore, the Loan Center broker.  Plaintiff sued, claiming that the fee to D&E Services was broker compensation and a point and fee for purposes of HOEPA. The court rejected this argument because "Moore worked for The Loan Center in the capacity of a loan officer, and *he has never been an officer, director or shareholder of The Loan Center. . .. The Loan Center does not own, operate or have any affiliation with D & E.*" Cunningham v. EquiCredit Corp. of Illinois, 427 F. Supp. 2d 838, 842 (N.D. Ill. 2006)(emphasis added).  This conclusion was affirmed (without in-depth discussion on this point) by the Seventh Circuit. Cunningham v. Nationscredit Fin. Services Corp., 497 F.3d 714 (7th Cir. 2007).

By negative implication, this decision demonstrates that the $4,800 payment to Nationwide is broker compensation.  Here, Duncan is an officer and owner of both the nominal broker and the entity receiving the payment.  Thus, the connection missing in Cunningham is undeniably present here, plus more.   There is not only common ownership and control, but Duncan admits to commingling income streams of the two companies.  Based on these facts, the jury could find that the payment to Nationwide was, for all purposes, a payment to the broker.

Second, the *post hoc* explanation by US Bank that the charge is compensation for the temporary HVAC system conflicts with other evidence in the record.  It is undisputed that Duncan imposed a credit card charge, prior to the loan closing, of $5,000; and that this charge was specifically identified as payment for the HVAC system.  Therefore, even if the jury were to believe that there was an agreement to install the system, the evidence demonstrates that Duncan had already paid himself for the unit and, therefore, the $4,800 charge was simply an additional fee paid to him for brokering the loan.

Third, US Bank's *post hoc* explanation is refuted by the Godfreys' testimony that they never agreed to the installation of the  HVAC unit, much less to pay $4,800 for it.  The documents which US Bank produced late in this litigation in an attempt to buttress this explanation do not negate the jury issue.  The Godfreys insist that they never saw or signed these documents.  It is axiomatic that a party may testify as to authenticity of his or her own signature.  Williams v. Riddlesperger, 227 Ala. 113, 115, 148 So. 803, 805 (1933); Hayes v. Banks, 132 Ala. 354, 356, 31 So. 464, 465 (1902). Moreover, because the Godfreys are familiar with each other's signatures and because that familiarity was not acquired for this litigation, Rule 901(b)(2), *Federal Rules of Evidence*, allow their testimony as proof that the signatures are not authentic. Fed. R. Evid. 901(b)(2).  This is ample evidence upon which the jury could find that there never was an agreement to pay $4,800 for an HVAC system and the attempt to document such an agreement has been contrived.

Also, US Bank incorrectly dismisses the possibility that the fee could be a finance charge simply on the argument that the charge was not required as part of the financing. US Bank's own evidence refutes this point.  As pointed out above, Mrs. Godfrey testified that there was no agreement with Nationwide regarding the HVAC system.  This was installed as a temporary measure because the *financing company required it* in order to approve the loan.  The fact that this was required as part of the financing is actually confirmed by US Bank's witness:

A.     From reviewing the loan requests I understand because we originally declined the application due to the collateral that the customer went out and made the collateral up to what we required to be able to lend against it.

Q.     So this (the heat pump) was added to increase the value of the collateral?

A.     No, not to increase the value of it, to make the collateral acceptable to us.  As I mentioned earlier today, we require that all of our collateral is habitable and that it has all the basic requirements, and one of those requirements is there is an affixed system to be able to properly heat the residence.

13

(Simon Depo., (Ex.14), pp. 54-55).

This clearly established the HVAC installation as a requirement by the lender in connection with financing of the contract.  The case relied upon by US Bank does not change this.  Curtis v. Secor Bank, 896 F. Supp. 1115, 1119 (M.D. Ala. 1995).  The charge at issue in that case was a overnight mailing charge imposed by the closing agent.  Judge De Ment held that this was not a finance charge simply on the conclusion that there was no evidence that the lender controlled how the mailing was to be accomplished or required overnight delivery.  Id., at 1119-20.  This has no application here as there is evidence supporting a finding that the HVAC charge was required by the lender.

For all these reasons, there exists questions of fact as to whether the $4,800 charge is a "point and fee."  The motion with respect to Count VI is, therefore, due to be denied.

**B.**     **The RESPA Claim**

Count VII states a claim for violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601.  Specifically, Plaintiffs allege that US Bank violated the provisions pertaining the Qualified Written Requests set out in Section 2605(e).  In pertinent part, that provision requires that the mortgage servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays); and shall, within 60 days, provide the information requested by the borrower and take appropriate action or make "appropriate corrections."  15 U.S.C. 2605(e)(2).

The Godfreys' QWR set out a specific request for action (cancellation of the loan) and detailed explanation for what that action is appropriate.  The letter also requested specific information and documents, all pertaining to the loan.

14

It is undisputed that US Bank did not take the action requested by the Godfreys. If the jury were to determine that the loan is governed by HOEPA, then US Bank was clearly required to cancel the loan. Therefore, the existence of a fact issue as to the HOEPA claim by extension prohibits summary judgment of the RESPA claim.

In addition, US Bank failed to provide the information requested. First, it never provided the payment history requested. (See Exhibit 15). Second, it only provided the documents pertaining to the HVAC system (Exhibits 11 and 13) just prior to the depositions; some 18 months after the QWR, well beyond the time-frame set out in Section 2605(e).

Summary judgment is due to be denied as to Count VII.[5]

## C.   **Plaintiffs' State-Law Claims**

Plaintiffs concede that discovery has not revealed evidence sufficient to sustain vicarious liability as to US Bank for the state law claims asserted against Nationwide and First Choice. Therefore, Counts I - V are due to be dismissed.

---

[5]Plaintiffs agree with US Bank that discovery has not revealed evidence that the Godfreys were actually charged for the response to the QWR, despite the clear indication in US Bank's response that it would charge $10 "per document." (Mr. Simon interpreted this as $10 per page). While the threat of imposing this shockingly high charge is obviously meant to chill efforts to assert the legal right to access information as to one's mortgage, the lack of evidence that the charge was in fact imposed demonstrates that 12 U.S.C. § 2605(k)(1)(B) was not violated.

## CONCLUSION

For all the reasons stated above, US Bank's motion for summary judgment is due to be denied as to Counts VI, VII and VIII.

/s/ Kenneth J. Riemer
KENNETH J. RIEMER (RIEMK8712)
Underwood & Riemer, P.C.
Attorney for Plaintiffs
166 Government Street, Suite 100
Mobile, Alabama 36602
251.432.9212

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2012 I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record.

/s/ Kenneth J. Riemer
KENNETH J. RIEMER

16