**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DEMETRIC GODFREY, *et al.*,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 12-0081-WS-B** |
| | ) |
| **NATIONWIDE VINYL SIDING &** | ) |
| **HOME IMPROVEMENT, LLC, *et al.*,** | ) |
| | ) |
| **Defendants.** | ) |

**ORDER**

    This matter comes before the Court on the Motion for Summary Judgment (doc. 22) filed by the sole remaining defendant, U.S. Bank, N.A.  The Motion has been briefed and is now ripe for disposition.[1]

**I.    Nature of the Case / Procedural Posture.**

    Plaintiffs, Demetric and Deborah Godfrey, originally brought this action against three defendants following a botched construction job to build an addition to their home.  In particular, the contractor hired to perform the work took payment but did not complete the job, leaving plaintiffs with a substantial debt obligation for a construction project that was never finished.  Two of the named defendants, Nationwide Vinyl Siding & Home Improvement, LLC ("Nationwide") and First Choice Mortgage, LLC ("First Choice"), failed to appear or defend in these proceedings.  A default judgment in the amount of $180,500 was entered in plaintiffs'

---

    [1]    The Rule 16(b) Scheduling Order entered by Magistrate Judge Bivins on April 5, 2012 provides that "[i]f a party's exhibits in support of or in opposition to a motion exceed fifty (50) pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery."  (Doc. 5, § 13(c).)  U.S. Bank complied with this requirement, but plaintiffs did not.  Nonetheless, in its discretion, the Court will consider plaintiffs' exhibits as submitted.

favor and against Nationwide and First Choice back on February 1, 2012.  (*See* doc. 28, Exh. 2.)[2]
Plaintiffs are endeavoring to enforce that default judgment; however, in the meantime, they
continue to pursue their claims in this litigation against the remaining defendant, U.S. Bank,
N.A. ("U.S. Bank").

The operative pleading asserts a laundry list of causes of action against U.S. Bank.  In
particular, plaintiffs allege that U.S. Bank was liable for Nationwide's breach of the construction
agreement (Count One); that U.S. Bank was liable for Nationwide's negligence and wantonness
in its dealings with the Godfreys (Counts Two and Three); that U.S. Bank was liable for
Nationwide's negligent and wanton hiring, supervision and training (Counts Four and Five); that
U.S. Bank violated the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA") and the Home
Ownership and Equity Protection Act of 1994 ("HOEPA")[3] by not making required disclosures
for a high-cost loan, thereby affording the Godfreys a statutory right to rescind the loan
transaction as well as other remedies (Count Six); that U.S. Bank violated the Real Estate
Settlement Procedures Act, 12 U.S.C. §§ 2601 *et seq.* ("RESPA") by failing to take appropriate
action (*i.e.*, canceling the loan, providing requested information) in response to the Godfreys'
Qualified Written Request (Count Seven); and that plaintiffs are entitled to injunctive and
declaratory relief for those violations (Count Eight).

---

[2]    On November 26, 2012, the undersigned entered an Order (doc. 34) amending
that default judgment against Nationwide and First Choice to correct a party misnomer by
identifying Nationwide's "formerly known as" and "doing business as" names, so as to facilitate
the Godfreys' ongoing collection efforts.

[3]    Although the statutes are often discussed separately, HOEPA is simply an
amendment to TILA.  *See, e.g., Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1176 n.3 (10th
Cir. 2012) ("HOEPA is just an amendment to TILA itself").  "By its terms, HOEPA seeks only
to regulate a special class of loans known as 'high-cost mortgages.' … If a loan qualifies as a
high-cost mortgage, HOEPA requires the lender to comply with special disclosure requirements
and prohibits the mortgages from containing certain potentially abusive terms."  *McLeod v. PB
Inv. Corp.*, 2012 WL 3105077, *2 n.5 (4th Cir. Aug. 1, 2012) (citations omitted); *see also
Cunningham v. Nationscredit Financial Services Corp.*, 497 F.3d 714 (7th Cir 2007) (TILA "was
subsequently amended by HOEPA, which requires lenders to make additional disclosures to
borrowers of 'high-cost' or 'high-rate' loans."); *Smith v. U.S. Bank, N.A.*, 2011 WL 2470100,
*10 (D. Or. Apr. 22, 2011) ("The HOEPA requires lenders to make certain disclosures to
borrowers of 'high cost' or 'high rate' loans."); *Woody v. Bank of America Corp.*, 2010 WL
2942029, *3 (E.D.N.C. July 20, 2010) ("HOEPA, which amended TELA [*sic*], requires creditors
to make additional disclosures to borrowers of 'high-cost' or 'high-rate' loans.").

U.S. Bank has moved for summary judgment on all causes of action asserted against it in the Amended Complaint. The Godfreys acknowledge that Counts One through Five are properly dismissed at this time,[4] but insist that triable issues remain as to Counts Six through Eight.

## II.    Relevant Facts.[5]

The record in the light most favorable to plaintiffs reveals the following facts: In the fall of 2008, the Godfreys entered into a contract with Nationwide, pursuant to which Nationwide promised to build an addition to the Godfreys' home. (Ms. Godfrey Dep., at 12-13.) The contract signed by Nationwide and the Godfreys on September 5, 2008, provided that the "project will consist of a two story addition to the existing structure as well as remodeling the existing premises." (Ms. Godfrey Dep., Exh. 1, at 1.) Phase one of the project (which is the only portion of the job relevant to this dispute) contemplated "construction of a 984 sq ft, two story addition, 339 sq ft upstairs and 645 sq ft downstairs." (*Id.*) The contract identified the phase one contract price as $62,500, to include a $10,000 downpayment, with a remaining balance of $52,500 to be paid at closing. (*Id.*)

Nothing in the contract specified that Nationwide was to install a heat pump at the Godfreys' property. Plaintiffs' evidence is that they never agreed to have Nationwide install a new heating and air-conditioning system as part of phase one. (Ms. Godfrey Dep., at 19.) Rather, plaintiffs' understanding was that Nationwide would be installing central air and heat as part of the second-phase remodeling project. (*Id.* at 21, 23, 91.)[6] The record contains an

---

[4]       In particular, plaintiffs' summary judgment brief includes the following statement: "Plaintiffs concede that discovery has not revealed evidence sufficient to sustain vicarious liability as to US Bank for the state law claims asserted against Nationwide and First Choice. Therefore, Counts I – V are due to be dismissed." (Doc. 29, at 15.) Based on both sides' concurrence that dismissal is appropriate as to the state-law causes of action (breach of contract, negligence, wantonness) against U.S. Bank, U.S. Bank's Motion for Summary Judgment is **granted** as to Counts One through Five, and all such claims are **dismissed**.

[5]       The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiffs' evidence is taken as true and all justifiable inferences are drawn in their favor.

[6]       Ms. Godfrey's testimony on this point was as follows: "The air conditioner was supposed to been in phase two. The reason it was supposed to been in phase two because phase one was going up first. The air condition was a part of phase two. And the air condition was (Continued)

unsigned document dated October 22, 2008 labeled "Central Air and Heat Installation," reflecting that Nationwide would install a 2½ ton York heat pump system (with ductwork) at the Godfreys' residence, and providing for a balance due of $4,800, to be paid at closing.  (Ms. Godfrey Dep., at Exh. 2.)  Plaintiffs' evidence, however, is that they never saw this document, and that they never came to any agreement with Nationwide for installation of a heating and air conditioning unit at their property during phase one.  (Ms. Godfrey Dep., at 19-20.)[7]

Unfortunately, the Godfreys' home's heating system became a stumbling block to the loan financing process.  The September 5 contract specified that the Godfreys would seek financing for phase one of the project through mortgage broker First Choice.  (Ms. Godfrey Dep., Exh. 1.)  Plaintiffs' contact at First Choice was Charlotte Duncan.  (Ms. Godfrey Dep., at 13-14.)  Plaintiffs completed a loan application for First Choice.  (*Id.* at 28.)  Thereafter, First Choice lined up U.S. Bank as a potential lender to fund the transaction, pursuant to a Broker Lending Agreement between First Choice and U.S. Bank.  (Duncan Dep., at 64, 87; Simon Aff. (doc. 22, Exh. 1), ¶ 3.)[8]  The relationship between First Choice and U.S. Bank was strictly arm's length; indeed, record evidence shows that U.S. Bank was one of multiple lenders with which First Choice worked, and that U.S. Bank did not control the business operations of First Choice

---

supposed to be big enough that it would cool phase two and phase one.  That's why it was not supposed to been installed yet because we had to wait 'til we finished phase one."  (*Id.* at 91.)

[7]     The record also contains an "Addendum A" to the September 5, 2008 contract between Nationwide and the Godfreys.  This Addendum provides that, as part of the construction project, Nationwide will install "a central air and heat unit, appropriate [*sic*] to effectively heat and cool the entire residence, … with ductwork being ran [*sic*] and installed into the existing house."  (Simon Dep., at Exh. 2.)  Addendum A purports to contain both Mr. and Ms. Godfrey's signatures; however, they aver that those signatures are forgeries, that Addendum A was never presented to them, and that they would have refused to sign Addendum A had it been so presented.  (Ms. Godfrey Aff. (doc. 30-15), ¶ 5; Mr. Godfrey Aff. (doc. 30-16), ¶ 5.)  Accordingly, the Court accepts as true for summary judgment purposes that the Godfreys never saw, signed or agreed to the terms of the purported "Addendum A" relating to installation of a heating and air conditioning unit.

[8]     The Simon Affidavit references multiple exhibits ostensibly appended thereto; however, no such exhibits were attached to the filed iteration of the affidavit.  This omission is not material to any genuine issues presented on summary judgment and does not meaningfully alter the analysis herein.

or Nationwide.  (Duncan Dep., at 86-88; Simon Aff., ¶¶ 6, 9.)[9]  At any rate, when First Choice initially approached U.S. Bank about the Godfreys' loan application, U.S. Bank declined the loan because the proffered collateral (*i.e.*, the Godfreys' house) was not acceptable to U.S. Bank without "an affixed system to be able to properly heat the residence."  (Simon Dep., at 55.)

In late September or early October, Charlotte Duncan called Ms. Godfrey and explained to her "that in order for the finances to go through that they had to install a heating and air conditioner because whoever the finance company was that they did not like … the window units and they did not like the way the appraiser had wrote the heat up."  (Ms. Godfrey Dep., at 21, 23.)  The Godfreys understood that "in order for us to obtain the loan from whoever the vendor was that was going to loan us the money, … they had to go in and put in central air and heating."  (*Id.*)  Ms. Godfrey balked that they did not have the money to pay for such a job and that, besides, central air and heat were part of the phase-two remodeling plan, not the phase-one addition plan.  (*Id.*)  Ms. Duncan assured Ms. Godfrey that she "didn't have to worry about it because they [meaning Nationwide] were going to pay for it."  (*Id.* at 21-22.)  Following this conversation, a Nationwide representative (Steve Cooper) notified Ms. Godfrey that Nationwide was "making the arrangements for someone to come out and install central air and heat."  (*Id.* at 22.)  What Nationwide actually installed at the Godfreys' residence was not central air and heat, but a heat pump, much to Ms. Godfrey's dismay.  (*Id.* at 22-23.)

Whatever failings she may have had in communicating with the Godfreys, Charlotte Duncan of First Choice notified U.S. Bank of the heat pump arrangements via facsimile transmission dated October 23, 2008, and re-transmission dated October 27, 2008.  (Ms. Godfrey Dep., at Exh. 2.)[10]  That fax indicated that Nationwide was installing a heat pump and duct work

---

[9]     Uncontroverted record evidence shows that U.S. Bank began sending written materials (early disclosures, correspondence, etc.) to the Godfreys concerning the contemplated loan on or about September 13, 2008.  (*See* doc. 30-4.)  As such, notwithstanding their protests that they viewed First Choice as the lender, plaintiffs were fully aware of U.S. Bank's role as prospective lender in this transaction by no later than mid-September 2008.

[10]     There is ambiguity in the record as to whether these facsimile transmissions occurred in September 2008 or October 2008.  The fax cover page reflects dates of September 23, 2008 and September 27, 2008; however, the fax headers showing date and time reflect transmission dates of October 23 and October 27.  Furthermore, it appears impossible for the transmission to have occurred in September given that the attachment (*i.e.*, the document purporting to show Nationwide's arrangement with the Godfreys for installation of a heat pump, (Continued)

at the Godfreys' home for a total cost of $4,800, to be paid at closing. (*Id.*) There is no dispute that, as of late October 2008, U.S. Bank understood such an arrangement to be in place (even if the Godfreys did not). Indeed, U.S. Bank must have been aware of and satisfied with this heat pump installation, given that it ultimately approved and funded the Godfreys' loan (which it had previously declined, deeming the collateral inadequate for lack of an affixed heating system).

The Godfreys closed on the loan with U.S. Bank on November 10, 2008. The closing agent was a company called Refi, Inc., which is not a party to this dispute, is not affiliated in any way with U.S. Bank, and was not controlled by U.S. Bank in administering the closing. (Stewart Aff. (doc. 22, Exh. 2), ¶¶ 3-6; Simon Aff., ¶¶ 11-14.) On the date of the closing, Mr. Godfrey signed an Adjustable Rate Note in which he promised to repay U.S. Bank the principal sum of $61,200. (Ms. Godrey Dep., at Exh. 13.) The Godfreys received and signed a Truth-in-Lending Disclosure Statement identifying the lender as U.S. Bank, the borrowers as the Godfreys, and enumerating certain finance charges and fees. (*Id.* at Exh. 19.) In particular, the Disclosure Statement itemized prepaid finance charges in the amount of $1,719.74 (including a broker fee of $612.00 paid to First Choice), plus a yield spread premium of $1,224.00 paid outside closing by U.S. Bank to First Choice, and other fees (appraisal, doc prep, title insurance, and recording) totaling $904.80. (*Id.*) Nothing in that Disclosure Statement referenced a heat pump, much less a $4,800 payment to First Choice, Nationwide or anyone else.

At the November 10 closing, the Godfreys also received and signed a HUD-1 Settlement Statement. (Stewart Aff. (doc. 22, Exh. 2), at ¶ 7 & Exh. A.) That Settlement Statement accounted for every penny of the $61,200 the Godfreys were borrowing from U.S. Bank. Of particular relevance to this lawsuit are lines 1306 and 1307. The former lists a payment of $52,500.00 to Nationwide with the explanation "payoff nationwide vinyl siding co." (Stewart Aff., Exh. A.) The latter lists a payment of $4,800 to Nationwide with the cryptic description "nationwide vinyl siding." (*Id.*) The Godfreys "looked at" the HUD-1 before they signed it, but did not review lines 1306 and 1307 and did not know what the $4,800 payment represented. (Ms. Godfrey Dep., at 56-57.) No one "went over" the $4,800 charge with them at the closing,

---

with the $4,800 balance to be paid at closing) is itself dated October 22, 2008. Be that as it may, the discrepancy in months is not material to the summary judgment analysis, and does not affect the outcome.

and they did not know what it was for.  (*Id.* at 56-58.)[11]  Nor, apparently, did the Godfreys ever inquire of anyone about the nature or purpose of that disbursement from the loan proceeds.

At any rate, following the closing and the funding of the loan by U.S. Bank, the loan proceeds were distributed in the manner specified in the HUD-1 Settlement Statement.  U.S. Bank did not retain or share in any of the funds paid out to First Choice, Nationwide, or other third-party vendors in connection with the closing.  (Simon Aff., ¶¶ 7, 10, 14, 18.)  The $4,800 charge listed in the HUD-1 was paid in full to Nationwide, with U.S. Bank retaining none of it. (Duncan Dep., at 93.)

Unfortunately, plaintiffs' problems with Nationwide escalated after the closing. Nationwide had indicated that construction on phase one should begin shortly after Thanksgiving 2008.  (Ms. Godfrey Dep., at 66-67, 69.)  Yet Nationwide stalled and delayed, giving plaintiffs "the runaround" and failing to begin the work until February 2009.  (*Id.* at 65-69.)  Nationwide sent a crew to dig the foundation for the addition in mid-January; however, problems with the blueprints, permits and nonpayment of the crew quickly derailed these efforts.  (*Id.* at 69-70.) Construction proceeded in fits and starts thereafter.  (*Id.* at 70-71.)  By April 2009, Nationwide was no longer in business, and had effectively abandoned the Godfreys' construction job in an incomplete state despite Nationwide having already been paid in full.  (*Id.* at 12, 71.)

Eventually, the Godfreys filed suit against Nationwide, First Choice and U.S. Bank. After litigation commenced, the Godfreys' counsel sent a letter to U.S. Bank on February 4, 2011, captioned "Notice of Cancellation of Loan and Qualified Written Request."  (Ms. Godfrey Dep., at Exh. 22.)  The February 4 letter alleged that the Godfreys were entitled to rescind the loan under federal law because U.S. Bank had made inadequate disclosures under HOEPA/ TILA.  The letter also purported to be a "Qualified Written Request," in which the Godfreys asked for "[a] copy of the borrower's loan file including any and all documents executed in connection with this loan."  (*Id.*)  On March 3, 2011, U.S. Bank mailed a response to the

---

[11]      In point of fact, the Godfreys' confusion when they executed the closing documents extended well beyond the meaning of certain line items on the HUD-1.  Indeed, Ms. Godfrey testified that plaintiffs assumed U.S. Bank was going to hold the funds listed on the HUD-1 as disbursements to Nationwide, and release those funds incrementally to the Godfreys for payment to Nationwide as sequential stages of the construction process were completed. (Ms. Godfrey Dep., at 61-62.)  Nothing in the HUD-1 form said that, and no one from U.S. Bank or First Choice ever told plaintiffs that; rather, they simply assumed such to be the case.

Godfreys' counsel, expressing its position that the Godfreys "are not entitled to cancel or rescind the contract at this time." (Ms. Godfrey Dep., at Exh. 23.) U.S. Bank further noted that the Godfreys had requested the same information in both their Qualified Written Request and their discovery requests in the pending litigation, and stated, "Though we feel these concurrent requests are improper, U.S. Bank will provide this information once in response to both requests." (*Id.*) On April 6, 2011, U.S. Bank's counsel in this litigation mailed plaintiffs' counsel a copy of U.S. Bank's loan file for the Godfreys. (Doc. 22, Exh. 6.)

## III.    Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## IV.    Analysis.

As noted *supra*, the Godfreys concede that dismissal of Counts One through Five (the state-law causes of action) is appropriate. Therefore, this analysis focuses on the TILA/HOEPA cause of action set forth in Count Six of the Amended Complaint, and the RESPA cause of action set forth in Count Seven. If those claims fail, then the separate cause of action for injunctive and declaratory relief (Count Eight) likewise cannot stand.

**A.     TILA / HOEPA Cause of Action.**

      *1.     The Centrality of the "Points and Fees" Determination.*

There is no question that TILA, as amended by HOEPA, requires lenders to make certain additional disclosures to borrowers in "high-cost" or "high-rate" mortgage loan transactions.[12] To activate these disclosure obligations, a loan must be "a consumer credit transaction that is secured by the consumer's principal dwelling, other than a residential mortgage transaction … if … the total points and fees payable by the consumer at or before closing will exceed the greater of (i) 8 percent of the total loan amount; or (ii) $400." 15 U.S.C. § 1602(bb)(1)(B)(i)-(ii).[13]  The statute defines "total points and fees" as including, in relevant part, "all items included in the finance charge, except interest or the time-price differential" and "all compensation paid to mortgage brokers."  15 U.S.C. § 1602(bb)(4)(A)-(B).

The parties appear to agree as to the following matters: (i) U.S. Bank's loan to the Godfreys constitutes a consumer credit transaction secured by their principal dwelling, other than a residential mortgage transaction, for HOEPA purposes; (ii) U.S. Bank did not provide the Godfreys with HOEPA disclosures in connection with the November 2008 loan; (iii) if the $4,800 payment to Nationwide at closing constitutes a "point and fee," then HOEPA disclosures were required, U.S. Bank violated HOEPA/TILA by not providing them, and the Godfreys are entitled to cancel the loan; and (iv) if the $4,800 charge to Nationwide does not constitute a "point and fee," then the HOEPA disclosures were not triggered, U.S. Bank did not violate

---

      [12]      *See, e.g., Green v. Chase Bank USA, NA*, 2012 WL 3961230, *3 (N.D. Ill. Sept. 7, 2012) (HOEPA "was passed in 1994 as an amendment to TILA and establishes disclosure requirements and rules to govern 'alternative mortgages' that require high rates or fees."); *Lefont v. SunTrust Mortg., Inc.*, 2011 WL 679426, *5 (N.D. Ga. Jan. 27, 2011) ("HOEPA is an amendment to TILA that requires lenders to make additional disclosures on 'high cost' loans.") (citation omitted); *Bibbs v. Security Atlantic Mortgage Co.*, 2010 WL 3505176, *5 (E.D. Pa. Sept. 1, 2010) ("With respect to certain high cost mortgages, HOEPA requires additional disclosures beyond those required by TILA.").

      [13]      Plaintiffs' brief repeatedly cites 15 U.S.C. § 1602(aa) as the operative section of TILA/HOEPA; however, that section was redesignated as subsection (bb) by Pub.L. 111-203, § 1100A(1)(A) (July 21, 2010).  *See In re Thomas*, 476 B.R. 691, 696 n.18 (Bankr. D. Mass. 2012) ("Section 1602(bb) was formerly codified as § 1602(aa).  Dodd-Frank has also amended HOEPA in part ….  Dodd-Frank has not changed the applicable triggers for the … total points and fees that launch HOEPA protections.").

HOEPA/TILA, and plaintiffs enjoy no right of rescission.[14]  So the fate of U.S. Bank's Rule 56 Motion concerning Count Six turns on whether a reasonable factfinder could conclude that the $4,800 charge was a "point and fee."  Upon careful consideration of the parties' arguments, and viewing all record evidence in the light most favorable to the Godfreys, the Court answers this question in the negative.

U.S. Bank's argument is straightforward.  Its position is that the $4,800 charge was not a "point and fee" for HOEPA/TILA purposes because it represented a payment to Nationwide (the construction firm) for installation of a heat pump at the Godfreys' home, and fees for construction services do not equate to finance charges or mortgage broker compensation under applicable law.  U.S. Bank insists that the $4,800 charge was for the heat pump, as evidenced by documentation faxed to it by First Choice on two separate occasions showing that Nationwide was charging the Godfreys $4,800 for installation of a heat pump, with that amount to be paid at closing.  According to U.S. Bank, the heat-pump charge cannot be a "finance charge" because that term is defined by law to exclude "charges of a type payable in a comparable cash transaction," 15 U.S.C. § 1605(a), and Nationwide would have required the Godfreys to pay $4,800 for heat-pump installation no matter how they financed the deal.  (Duncan Dep., at 93.)  Furthermore, U.S. Bank reasons that the $4,800 payment could not be broker compensation because the record shows that those funds were disbursed to Nationwide, which was not a mortgage broker and performed no broker services in connection with the loan.  Plaintiffs counter that summary judgment is inappropriate because genuine fact questions remain as to whether that $4,800 charge was a "point and fee" for HOEPA purposes.

> **2.**     *Whether the $4,800 Charge was Broker Compensation.*

Plaintiffs' primary argument on summary judgment is that a reasonable finder of fact could conclude that the $4,800 charge was not for installation of a heat pump at all, but was

---

[14]     On the latter two points, U.S. Bank argues that "[t]he Godfrey Loan would only qualify as a 'high cost' loan if the $4800 heat pump payment is included in the finance charge" or broker compensation.  (Doc. 23, at 6 n.2.)  And the Godfreys concede that "the loan only qualifies as a 'high cost loan' if the $4,800 payment listed on line 1307 is considered a point and fee.  Without this inclusion of this payment as a 'point and fee,' the loan does not meet the trigger."  (Doc. 29, at 10.)  Accordingly, ancillary issues in the parties' briefs concerning whether other charges do or do not constitute "points and fees" are immaterial because they cannot change the final result, which depends solely on the proper classification of the $4,800 payment.

instead a hidden broker fee. Of course, "points and fees" under HOEPA are defined as including "all compensation paid to mortgage brokers." 15 U.S.C. § 1602(bb)(4)(B). Here, however, the Settlement Statement and other record evidence shows that the $4,800 was paid to Nationwide, which was a construction company and not a mortgage broker. *See* 12 C.F.R. § 226.36(a) (defining "mortgage broker" with respect to a transaction as "any loan originator that is not an employee of the creditor" and defining "loan originator" as "a person who for compensation or other monetary gain ... arranges, negotiates, or otherwise obtains an extension of consumer credit for another person"). Nationwide did not arrange, negotiate, or obtain credit for the Godfreys. First Choice did, but the $4,800 was not paid to First Choice. Other record evidence reflects that the purpose of the $4,800 was to compensate Nationwide for installing a heat pump at the Godfreys' home, not for any broker services (which Nationwide never provided anyway).

Notwithstanding the foregoing, the Godfreys insist that the nominal payee for the $4,800 charge is inconsequential, because "Nationwide and First Choice are the same business enterprise." (Doc. 29, at 11.) No reasonable factfinder could so conclude on this record. Plaintiffs' own evidence confirms that each of Nationwide and First Choice had its own distinct Articles of Organization as an Alabama limited liability company. (Doc. 30-5.) To be sure, Donald E. Duncan was listed as the organizer, member and registered agent of both entities. (*Id.*) But Duncan testified that they were separate companies with separate tax identification numbers. (Duncan Dep., at 85.) First Choice's business operations included financing Nationwide's construction projects; however, "the bigger part of First Choice's business" was loan refinancings that had nothing to do with Nationwide. (*Id.* at 38-39.) And First Choice remained in business for some period of time after Nationwide closed down. (*Id.* at 41.) Even taking all reasonable factual inferences in the light most favorable to plaintiffs, it could not be concluded that Nationwide and First Choice are the same business enterprise. The fact that they had common ownership and that Duncan would use money from First Choice to pay Nationwide's bills on occasion does not, in and of itself, render them "the same business enterprise," given the uncontroverted facts showing otherwise.[15]

---

[15]     On summary judgment, plaintiffs make much of the commingling of funds between the two entities. Duncan's testimony was clear, however, that he only moved funds in this manner "[o]n the way out," meaning as both businesses were in their death throes. (Duncan Dep., at 40.) There is no indication in the record that any such financial maneuvering was
(Continued)

Plaintiffs have also identified no legal framework that governs whether Nationwide and First Choice are "the same business enterprise" for TILA purposes.  More specifically, they point to no theory or doctrine that would allow this Court to pierce the corporate veil by treating a payment made to one entity for one stated purpose as a payment to a different entity for a different purpose simply because the two entities had common ownership and because funds generated by one entity were used by the other at certain times.[16]  On summary judgment, the Court cannot "fill in the blanks" to formulate a legal argument that a party has not.  *See, e.g., Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) ("district courts cannot concoct or resurrect arguments neither made nor advanced by the parties"); *M.R. v. Board of School Com'rs of Mobile County*, 2012 WL 3778283, *4 n.5 (S.D. Ala. Aug. 30, 2012) ("Federal courts do not develop parties' legal arguments for them."); *York v. Day Transfer Co.*, 525 F. Supp.2d 289, 301 n.10 (D.R.I. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh

---

ongoing between the two entities as of the November 2008 closing.  More importantly, plaintiffs gloss over Duncan's testimony that the commingling in question involved taking First Choice's brokerage money and using it to fund Nationwide's construction work.  (Duncan Dep., at 39-40.)  There is no evidence that Duncan ever took funds received by Nationwide and funneled them into First Choice.  This distinction is important because the Godfreys' argument hypothesizes that this is exactly what happened to the $4,800 paid to Nationwide in the Godfrey closing.  No reasonable factfinder could conclude on this record that Nationwide funds were diverted to First Choice, or that the $4,800 payment to Nationwide on November 10, 2008 for the heat-pump installation somehow ended up in First Choice's hands as broker compensation.

[16]       Plaintiffs have cited two cases from other jurisdictions; however, neither of them reasonably supports a conclusion that the nominal payee on the $4,800 can be ignored and that it can be assumed to represent a brokerage fee paid to someone else.  In *Hodges v. Swafford*, 863 N.E.2d 881, 887-88 (Ind.App. 2007), the court found that a person was acting as a mortgage broker for TILA purposes where she originated the transaction, took the applications, structured the loan, brought borrower and lender together, and so on.  The *Hodges* court said nothing about the relationship between the broker and any other entity, much less reclassification of a disbursement to one as a disbursement to the other.  Meanwhile, in *Cunningham v. EquiCredit Corp. of Illinois*, 427 F. Supp.2d 838, 842 (N.D. Ill. 2006), the court rejected an argument that payment to a third-party creditor was actually a hidden brokerage fee where that creditor company was owned by a person who worked for the mortgage broker.  *Cunningham* was decided on its narrow facts, and did not set forth any comprehensive legal framework for determining when a third-party creditor can be viewed as an alter ego of a mortgage broker; therefore, it is unilluminating as to the particular issue presented here.

on its bones.") (citation omitted).  Merely saying that "[t]he payment to Nationwide is for all practical purposes a payment to First Choice" (doc. 29, at 11) without (i) facts showing that Duncan ever transferred funds from Nationwide to First Choice, or (ii) exposition of a legal theory explaining how the corporate veil can be pierced in these circumstances, is not sufficient to withstand summary judgment.

Another problem with the Godfreys' argument that Nationwide and First Choice are the same entity is that it proves too much.  If the $4,800 payment to Nationwide at closing was actually a disguised brokerage fee being paid to First Choice, then what of the $52,500 payment to Nationwide at that closing?  The Godfreys do not dispute that the $52,500 was actually a bona fide payment to Nationwide for contracted construction services.  Yet their reasoning that the $4,800 payment was actually a hidden brokerage fee payable to First Choice would apply with equal force to the $52,500 payment, and provides no basis for distinguishing between the two payments.  Of course, any notion that the $52,500 payment actually represented a brokerage fee to First Choice would be absurd.  Because the Godfreys' theory (*i.e.*, that a payment to Nationwide was actually a payment to First Choice, and that any payment to Nationwide for construction services was actually a payment to First Choice for broker services) would appear to apply with equal force to that $52,500 figure, the infirmities in plaintiffs' position are plain.

With regard to plaintiffs' attempt to reclassify the $4,800 payment to Nationwide as a hidden brokerage fee to First Choice, the case of *Cunningham v. Nationscredit Financial Services Corp.*, 497 F.3d 714 (7th Cir. 2007), is instructive.  In *Cunningham*, the legal issue presented was whether certain funds should be considered in the "total points and fees" calculus for purposes of assessing whether the loan was a HOEPA "high-cost" loan.  The plaintiffs in that case refinanced their mortgage to make home repairs.  In that endeavor, the plaintiffs retained a mortgage broker called the Loan Center, with a loan officer named Moore being their point of contact.  The Loan Center collected a broker's fee at closing; however, Moore also directed that a separate $10,500 payment be made to an entity called D & E Services (of which Moore was the principal).  When Moore absconded with the funds, the plaintiffs demanded relief under TILA because the lender did not make the disclosures required for high-cost HOEPA loans.  The loan at issue in *Cunningham* could only qualify as a high-cost loan (triggering HOEPA disclosure requirements) if the $10,500 payment to D & E Services was included in "total points and fees." The plaintiffs maintained that the $10,500 sum was "a disguised broker fee" because Moore

-13-

(who worked for their broker, the Loan Center) cashed the check and received the proceeds.  The Seventh Circuit rejected that argument, reasoning as follows: "[N]either D & E Services nor Moore was their mortgage broker.  The HUD-1 Settlement Statement listed D & E Services as a creditor, and the Cunninghams signed the Settlement Statement, confirming that it was an accurate description of how their loan proceeds were to be distributed.  The Cunninghams also signed a Loan Brokerage Agreement that made the Loan Center their sole mortgage broker."  497 F.3d at 718.  Much the same could be said here.  Nationwide was clearly not the Godfreys' mortgage broker.  The HUD-1 Settlement Statement listed the $4,800 as being payable to Nationwide, not to First Choice; and Demetric Godfrey signed the Settlement Statement, confirming it to be a true and accurate description of how the loan proceeds were to be distributed.  The Godfreys contracted solely with First Choice (not Nationwide) to be their mortgage broker.  As such, the Godfreys' "hidden broker fee" argument fails under the Seventh Circuit's reasoning.

The other critical failing in plaintiffs' attempt to reframe a $4,800 payment to a construction company as a hidden brokerage payment to a mortgage broker is that there is no evidence linking the $4,800 to brokerage services.  Again, HOEPA provides that "points and fees" include "all compensation paid to mortgage brokers."  15 U.S.C. § 1602(bb)(4)(B).  But no record evidence supports a reasonable inference that the $4,800 was compensation to a mortgage broker (*i.e.*, compensation for mortgage broker services, such as arranging, negotiating, or otherwise obtaining an extension of consumer credit for another person).  The Settlement Statement reflects that First Choice was paid a $612.00 broker fee out of settlement proceeds, and a separate yield spread premium from U.S. Bank in the amount of $1,224.00 (paid outside of closing).  So First Choice was <u>already</u> being compensated for its mortgage brokerage services to the Godfreys and U.S. Bank, to the tune of $1,836.  Neither U.S. Bank nor First Choice has ever indicated that other compensation was intended or agreed between them in the Godfrey closing.  Plaintiffs have nothing other than their own speculation to show that the $4,800 was actually compensation to a mortgage broker.  Of course, speculation cannot suffice to ward off summary judgment.  *See, e.g., Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1185 (11th Cir. 2005)

("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation omitted).[17]

In light of the foregoing, the undersigned finds that there is no evidence from which a reasonable factfinder could conclude that the $4,800 payment constituted broker compensation that must be considered in the HOEPA/TILA calculus of whether the Godfrey loan was a high-cost loan governed by HOEPA disclosure obligations.

> 3.      *Whether the $4,800 Charge was a Finance Charge.*

Plaintiffs' other TILA/HOEPA argument is that the $4,800 payment to Nationwide is a "point and fee" because it constitutes a finance charge. As discussed *supra*, "points and fees" are defined as including "all items included in the finance charge, except interest or the time-price differential." 15 U.S.C. § 1602(bb)(4)(A). A "finance charge" for TILA purposes is "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); *see also Virachack v. University Ford*, 259 F. Supp.2d 1089, 1093 (S.D. Cal. 2003) (to be a "finance charge" under TILA, a fee must be "(1) a charge, (2) directly or indirectly payable by the consumer, (3) imposed directly or indirectly by the creditor, and (4) as an incident or condition of the extension of credit"). Regulation Z reinforces these requirements, explaining

---

[17]        To be sure, plaintiffs claim that two pieces of evidence support their contention that the $4,800 payment was actually broker compensation. First, they identify a credit card statement for an account opened by Nationwide in the Godfreys' name showing a charge on October 16, 2008 for $5,000 payable to Nationwide for "Purchase HVAC; Other." (Doc. 30-8, at 1.) Second, plaintiffs rely on their own testimony that they never agreed to pay Nationwide anything (much less the sum of $4,800) for the heat-pump installation. These facts are accepted as true for summary judgment purposes, but they do not help the Godfreys' TILA/HOEPA claim. Certainly, these facts may support a reasonable inference that Nationwide charged them twice for a heat pump (or that the heat pump installation was an expensive job totaling $9,800). They may support a reasonable inference that Nationwide deceived the Godfreys by charging them for a heat pump that the Godfreys never agreed to pay for. But these facts do <u>not</u> support a reasonable inference that the $4,800 payment did not actually go to Nationwide, as indicated in the Settlement Statement which Mr. Godfrey signed and to the accuracy of which he attested. It is one thing to suggest (as these facts do) that Nationwide ripped off the plaintiffs with regard to the heat-pump installation. It is quite another to suggest (as these facts do not) that the $4,800 payment never went to Nationwide at all, had nothing to do with the heat pump, and was instead some kind of disguised broker fee paid to First Choice based on a secret arrangement between U.S. Bank and First Choice. Such a vast inferential leap is simply not supported by the record.

that "[t]he finance charge is the cost of consumer credit as a dollar amount.  It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit."  12 C.F.R. § 226.4(a). Significantly, both statute and regulation expressly exclude from that definition all charges of a type payable in cash transactions.  *See* 15 U.S.C. § 1605(a) ("The finance charge does not include charges of a type payable in a comparable cash transaction."); 12 C.F.R. § 226.4(a) ("It does not include any charge of a type payable in a comparable cash transaction.").

   The Godfreys maintain that the $4,800 payment to Nationwide for installation of the heat pump meets the statutory definition of a finance charge because that construction work was performed at U.S. Bank's behest as a prerequisite to loan approval.  (Doc. 29, at 14.)  Certainly, there is record evidence that U.S. Bank has habitability requirements for collateral, that "one of those requirements is there is an affixed system to be able to properly heat the residence" (Simon Dep., at 55), and that U.S. Bank initially declined the Godfreys' loan application because it deemed their collateral (*i.e.*, the home) inadequate on that basis.  Here's the fundamental problem: Plaintiffs do not cite (and the Court has been unable to find) any authority in which any court anywhere has ever extended TILA's "finance charge" concept to this sort of expense. Stated differently, it does not appear that anyone (court, agency, legislator, commentator) has ever construed the cost of repairing or improving collateral antecedent to loan approval as a "finance charge" for TILA purposes.

   To be sure, a litigant's arguments are not inherently doomed by their novelty.  But the Godfreys' finance charge theory also bears a host of legal and logical defects.  First, it ignores the fact that the Godfreys submitted two loan applications to U.S. Bank.  (Simon Dep., at 54.) After the first application was rejected, Nationwide installed a heat pump at the Godfreys' residence, then First Choice submitted a second application that was ultimately accepted.  A construction expense incurred by the borrower <u>before</u> submitting the operative application for credit to a lender cannot reasonably be viewed as a charge that was "incident to or a condition of the extension of credit."  12 C.F.R. § 226.4(a); *see also Haynes v. Planet Automall, Inc.*, 276 F.R.D. 65, 75 (E.D.N.Y. 2011) (plaintiff must prove that "the extension of credit *caused* plaintiff

to pay a particular fee or charge").[18]  Second, it is undisputed that U.S. Bank did not dictate to the Godfreys that they must install a heat pump, that they must pay Nationwide $4,800 for that work, or the like.  Plaintiffs (and not U.S. Bank) controlled the method and manner of satisfying the lender's habitability rules.  U.S. Bank did not tell the Godfreys that they must have a heat pump or that they must pay Nationwide $4,800 in order for credit to be extended.[19]  Such circumstances are inconsistent with the requirement that the $4,800 charge be "incident to or a condition of the extension of credit" in order to qualify as a finance charge.  Third, plaintiffs insist that it was a finance charge because the heat pump "was installed as a temporary measure." (Doc. 29, at 13.)  But U.S. Bank never required a "temporary" heating system, any more than it

_____

[18]       Another way of looking at the heat-pump charge is that it is somewhat akin to an application fee for a loan.  In order for U.S. Bank to agree to fund their loan, the Godfreys had to submit an application and they had to present satisfactory collateral.  Regulation Z specifies that TILA finance charges exclude "[a]pplication fees charged to all applicants for credit, whether or not credit is actually extended."  12 C.F.R. § 226.4(c)(1).  The official commentary to this section provides that "[a]n application fee that is excluded from the finance charge is a charge to recover the costs associated with processing applications for credit.  The fee may cover the costs of services such as credit reports, credit investigations and appraisals."  12 C.F.R. Pt. 226, Supp. I, Subpt. A (Official Staff Interpretation of Section 226.4(c)(1)).  If the application fee is not a finance charge, then any construction costs incurred in bringing the collateral into compliance with the lender's minimum standards likewise should not be a finance charge.  Both are preliminary, threshold expenses that are temporally and conceptually attenuated from charges incident to the issuance of credit itself after approval of the loan application.

[19]       In that regard, this case is analogous to *Curtis v. Secor Bank*, 896 F. Supp. 1115 (M.D. Ala. 1995), in which the lender required a first mortgage lien on the plaintiffs' residence. There was already a lien on that residence.  The *Curtis* court concluded that the charges incurred by the plaintiffs in satisfying the prior lien were not finance charges, reasoning as follows: "Secor Bank had no involvement in the method or manner of satisfaction of the prior lien. Rather, Secor Bank's only requirement was that it receive a first mortgage lien on the plaintiffs' residence.  The method of satisfying any prior lien was solely between the plaintiffs and the closing agent. … For aught that appears, the aforementioned matters were completely outside the control or knowledge of Secor Bank."  896 F. Supp. at 1119-20.  Likewise, in the case at bar, U.S. Bank had no involvement in the method or manner of satisfaction of its habitability requirements; rather, it simply said that the Godfreys' home must satisfy those standards, including the affixed-heating system criterion, before it would approve the loan.  The method in which that heating criterion was satisfied (*i.e.*, what kind of heating system, when installed, by whom, what price, how financed) was solely between the Godfreys and Nationwide, with U.S. Bank exerting no control and having no knowledge of these details until after the fact.  That Nationwide may have misled the Godfreys or failed to inform them of their options concerning habitability standards in no way alters the classification of the $4,800 payment under TILA.

required any other habitability standards to be satisfied by quick-fix, interim means.  Plaintiffs could have used the occasion to install a permanent heat system with long-term benefits to the Godfreys extending far beyond the financing of the loan.  Their election not to do so does not render U.S. Bank's habitability standard for collateral a mandatory charge that a borrower must incur solely for the purpose of obtaining financing.

Fourth, plaintiffs' argument overlooks the statutory exclusion from "finance charges" of "charges of a type payable in a comparable cash transaction."  15 U.S.C. § 1605(a).  Nationwide charged the Godfreys $4,800 not because they paid for the construction project via mortgage loan, but because Nationwide installed a heat pump at their home.  Uncontroverted evidence shows that Nationwide would have charged plaintiffs that same $4,800 figure for installation of the heat pump whether they paid by cash or credit.  (Duncan Dep., at 93.)  Fifth, plaintiffs' position cannot be correct because it would yield absurd consequences.  If TILA finance charges were to encompass the cost of construction services performed to bring the borrower's home into compliance with the lender's collateral habitability standards, then the same result would obtain for a farflung array of home improvement / creditworthiness charges incurred by a borrower prior to the approval of his/her loan application that have nothing to do with the cost of credit.  For example, if the lender's habitability requirements said the collateral must have a roof that was less than 15 years old, and the borrower's home's roof was 16 years old, then the full cost of a new roof would become a TILA "finance charge."  Or if the lender required a first mortgage lien on the residence, and the property already had a mortgage lien, then the borrower's cost of paying off that pre-existing mortgage lien would likewise be considered a TILA "finance charge" for the new loan.[20]  Such an expansive reading would not serve TILA's remedial purposes, but would in fact frustrate them by effectively rendering "finance charge" disclosures meaningless through the inclusion of a sea of big-ticket extraneous charges obscuring (rather

---

[20]   For another convenient hypothetical, suppose the lender required that no borrower could have pre-existing debt above a certain ceiling.  Suppose further that the borrower's pre-existing debt exceeded that ceiling.  Under the Godfreys' reasoning, the cost to the borrower of paying off those other lenders to reduce the borrower's overall debt burden to fit the lender's criteria would itself constitute a "finance charge" for TILA purposes as to the new loan.

than clarifying) the actual cost of credit.[21]  Absent a clear indication (which does not exist) in the statutory language, regulations, or case law that the "finance charge" concept was intended to have such far-reaching impacts, the Court will not construe TILA in such a counterintuitive and unconstructive manner.

In short, nothing in TILA, its implementing regulations or the case law directly supports the proposition that a $4,800 payment for installation of a heat pump at the Godfreys' home constitutes a finance charge that must be included in the "points and fees" tally for HOEPA eligibility.  Moreover, the Court is convinced that construing TILA in the manner sought by the Godfreys on this point would be unreasonable and inappropriate.  The cost incurred by the Godfreys for Nationwide to install a heat pump at their home was not incident to the extension of credit by U.S. Bank; rather, that expense predated the operative loan application, the method and manner of the Godfreys' compliance with U.S. Bank's eligibility criteria were not dictated by U.S. Bank, U.S. Bank never required a "temporary" fix solely for purposes of obtaining credit, the cost of the heat-pump installation would have been the same regardless of whether the Godfreys paid in cash or credit, and logic and common sense counsel against the breathtakingly expansive reading of TILA championed by plaintiffs.

For all of the foregoing reasons, the $4,800 was not a finance charge, nor was it a broker fee.  As such, the Court finds no genuine issues of material fact and determines that this payment was not a "point and fee" that factored into the calculation of whether the Godfreys' loan was a high-cost loan triggering HOEPA disclosure requirements.  Given that the $4,800 was not a "point and fee," the Godfreys' loan was not subject to HOEPA disclosures.  In light of that

---

[21]      It is hornbook law that TILA's "limited office is to protect consumers from being misled about the cost of credit."  *Cunningham*, 497 F.3d at 718 (citation omitted); *see also Haynes*, 276 F.R.D. at 74-75 (same); 15 U.S.C. § 1601(a) (describing purpose of TILA as being "to assure a meaningful disclosure of credit terms so that the consumer will be able to … avoid the uninformed use of credit").  "*Meaningful* disclosure does not mean *more* disclosure.  Rather, it describes a balance between competing considerations of complete disclosure and the need to avoid informational overload."  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 568, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980) (citation and internal marks omitted).  The Godfreys' argument would destroy that balance and obscure the economic substance of the loan transaction with a welter of superficially related charges and expenses, leaving the borrower bewildered as to what the actual cost of credit was, versus what he/she was paying for things like a new roof or a preexisting mortgage payoff.

conclusion, U.S. Bank did not violate TILA/HOEPA by failing to make such disclosures. Defendant is entitled to summary judgment on Count Six.

> **B.      *RESPA Cause of Action.*

The parties agree that the Godfreys' claim under the Real Estate Settlement Procedures Act ("RESPA"), which is found at Count Seven of the Amended Complaint, is partially intertwined with the HOEPA/TILA claim.  In particular, insofar as the RESPA claim rests on U.S. Bank's refusal to rescind or cancel the loan upon the Godfreys' request, the parties concur that such refusal would support a RESPA claim here only if there were an underlying HOEPA/TILA violation giving rise to such a right to cancel.[22]  The Court having concluded as a matter of law that the Godfreys' loan was not a high-cost loan within the ambit of HOEPA, U.S. Bank's failure to provide the Godfreys with HOEPA disclosures did not empower plaintiffs to rescind the loan.  To the extent, then, that plaintiffs' RESPA cause of action is predicated on U.S. Bank's refusal to rescind the loan upon plaintiffs' written request, U.S. Bank is entitled to summary judgment.

There is, however, another aspect of the Godfreys' RESPA claim that is not inextricably bound to their HOEPA/TILA claim.  The Godfreys (by and through counsel) sent a letter to U.S. Bank on February 4, 2011 (after the commencement of this litigation) demanding certain information, including "[a] complete payment and transaction history for this loan," and "[a] copy of the borrower's loan file including any and all documents executed in connection with this loan."  (Doc. 30-17, at 4.)  U.S. Bank issued a written response on March 3, 2011, indicating that (among other things) U.S. Bank believed the request to be duplicative of discovery requests already made by the Godfreys in this litigation, that U.S. Bank believed such duplication to be improper, and that "U.S. Bank will provide this information once in response to both requests."  (Ms. Godfrey Dep., at Exh. 23.)  On April 6, 2011, U.S. Bank sent a letter to the Godfreys'

---

[22]      Plaintiffs acknowledge that "[i]f the jury were to determine that the loan is governed by HOEPA, then US Bank was clearly required to cancel the loan.  Therefore, the existence of a fact issue as to the HOEPA claim by extension prohibits summary judgment of the RESPA claim."  (Doc. 29, at 15.)  Defendant also recognizes the linkage between the claims, stating that "[b]ecause U.S. Bank is entitled to judgment as a matter of law on the Godfreys' TILA and HOEPA claims, it is similarly entitled to summary judgment on the Godfreys' RESPA claim."  (Doc. 33, at 7.)

counsel, stating "Please find enclosed U.S. Bank N.A.'s loan file, for the Godfreys, Bates labeled Godfrey-US Bank 001-162."  (Doc. 22, Exh. 6.)

Plaintiffs' Amended Complaint alleged that U.S. Bank violated the Qualified Written Request ("QWR") requirements of RESPA (as set forth at 12 U.S.C. § 2605(e)) by failing to respond "within the times set out in 12 U.S.C. § 2605(e)(1)," and failing "to conduct any reasonable investigation of the Plaintiffs' dispute or make appropriate corrections" as required by 12 U.S.C. § 2605(e)(2).  (Doc. 1-1, ¶¶ 67-68.)  Both of these alleged RESPA violations are conclusively rebutted by the summary judgment record, even taken in the light most favorable to the Godfreys.  Section 2605(e)(1) provides that if a loan servicer receives a QWR from a borrower, "the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays)."  12 U.S.C. § 2605(e)(1)(A).  U.S. Bank did so.  Plaintiffs' QWR was dated February 4, 2011 (a Friday) and transmitted via certified mail to U.S. Bank's offices in Fargo, North Dakota.  The earliest that U.S. Bank could have received the QWR was February 7, 2011 (a Monday).  Under § 2605(e)(1), the section of RESPA that plaintiffs' Amended Complaint says was violated, U.S. Bank had 20 days from February 7, 2011 (excluding weekends and legal public holidays) in which to provide a written response.  Excluding intervening weekends and the February 21 Presidents' Day legal holiday, then, U.S. Bank's written acknowledgment was due on or before March 8, 2011.  Undisputed record evidence shows that U.S. Bank provided written acknowledgement to the Godfreys' counsel on March 3, 2011, well before expiration of the 20-day period.  Accordingly, U.S. Bank is entitled to summary judgment on plaintiffs' RESPA claim that U.S. Bank failed to respond to the QWR "within the times set out in 12 U.S.C. § 2605(e)(1)" (doc. 1-1, at ¶ 67), as that accusation is disproven by uncontested facts.

The only other § 2605(e) violation alleged in the Amended Complaint is that U.S. Bank "failed to make appropriate corrections" to the Godfreys' account by cancelling their loan.  (Doc. 1-1, at ¶¶ 65, 68.)  For the reasons already stated, however, plaintiffs were not entitled to cancellation of their loan, which was not a HOEPA loan and therefore not subject to HOEPA disclosure requirements.  Accordingly, there could be no § 2605(e) violation in defendant's failure to rescind the loan in response to plaintiffs' QWR.  Defendant is entitled to summary

judgment on this aspect of the RESPA claim as well. There being nothing left of Count Seven, that claim will be **dismissed**.[23]

All of plaintiffs' statutory claims under TILA, HOEPA, and RESPA being fatally deficient, the Court finds that summary judgment is likewise appropriate on Count Eight, in which the Godfreys requested declaratory and injunctive relief in connection with those federal statutory causes of action as well as plaintiffs' now-abandoned state-law claims against U.S. Bank.

## V.    Conclusion.

For all of the foregoing reasons, the undersigned concludes that there are no genuine issues of disputed material fact in this case, and that U.S. Bank is entitled to judgment as a matter of law on all claims and causes of action asserted by the Godfreys herein.   Accordingly, defendant's Motion for Summary Judgment (doc. 22) is **granted** in its entirety.  The Godfreys' claims against U.S. Bank are **dismissed with prejudice**.   A separate judgment will enter.   There

---

[23]      In their summary judgment brief, plaintiffs assert in conclusory form that their RESPA claim survives because U.S. Bank "never provided the payment history requested" and provided documents pertaining to the heat-pump installation "some 18 months after the QWR, well beyond the time-frame set out in Section 2605(e)."  (Doc. 29, at 15.)  But these claims are nowhere set forth in the operative pleadings.  The Godfreys' Amended Complaint does not allege that U.S. Bank failed or declined to provide payment history information, or that it violated the 60-day requirement set forth in § 2605(e)(2).  The only information that the Amended Complaint says U.S. Bank failed to provide was identification of the owner or assignee of the loan, an omission that plaintiffs have abandoned on summary judgment.  (Doc. 1-1, at ¶¶ 66, 69.)  And the only time frame that the Amended Complaint says U.S. Bank violated was the § 2605(e)(1) deadline (which covers only acknowledgment of receipt within 20 days), not the § 2605(e)(2) deadline (which covers the provision of responsive information within 60 days). Plaintiffs cannot use their summary judgment brief as a *de facto* amendment to their pleadings. *See, e.g., GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1258 n.27 (11th Cir. 2012) ("It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings."); *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (liberal pleading standard of Rule 8 "does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. … A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  The Court therefore will not consider plaintiffs' attempt at this time to inject new RESPA claims concerning failure to furnish payment history and untimely provision of heat-pump documents, when the Amended Complaint yields no inkling that the Godfreys wished to interpose such claims.

being no remaining triable issues as to any party, the Clerk of Court is directed to close this file for administrative and statistical purposes.

DONE and ORDERED this 14th day of December, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE